IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

|                                                      |     |                                  |
|------------------------------------------------------|-----|----------------------------------|
| SERGEI VOLOCHAYEV,                                   | *   |                                  |
|    Plaintiff,                         | *   |                                  |
|                                                      | *   |                                  |
|                                                      | *   |                                  |
|      v.                     | *   | Civil Action No. 11-cv-00230-AW  |
|                                                      | *   |                                  |
| KATHLEEN SEBELIUS, SECRETARY,                        | *   |                                  |
|    U.S. DEPARTMENT OF HEALTH          | *   |                                  |
|    AND HUMAN SERVICES                 | *   |                                  |
|    Defendant.                         |     |                                  |

*******************************************************************************

## Memorandum Opinion

Plaintiff Sergei Volochayev ("Volochayev") brings this action against Defendant Kathleen Sebelius, Secretary of the United States Department of Health and Human Services ("the Agency") alleging discrimination on the basis of national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII") (Count I), and retaliation under Title VII (Count II). This case has already been litigated by an Administrative Law Judge ("ALJ") before the EEOC. On November 23, 2010, the ALJ issued a bench decision in favor of the Agency, finding that Volochayev failed to establish by a preponderance of the evidence that the Agency discriminated against him on the bases of national origin and retaliation. *See* Doc. No. 8 Ex. 4.  Plaintiff is entitled to *de novo* review of these claims. *See Chandler v. Roudebush*, 425 U.S. 840, 845-46 (1976).

Currently pending before the Court is Defendant's motion for summary judgment. *See* Doc. No. 8. The Court has reviewed the entire record, as well as the pleadings and exhibits, and finds that no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2010). For the reasons set forth below, the Court GRANTS Defendant's motion for summary judgment.

## I.    FACTUAL & PROCEDURAL BACKGROUND

The following facts are taken from the extensive administrative record attached to Defendant's motion for summary judgment and referenced by both parties in their briefings to the Court. Plaintiff Volochayev is a male of Russian ancestry who was employed in the ICU of the NIH Clinical Center from April 16, 2006 until April 2, 2008. Doc. No. 8 Ex. B at 10. Throughout his time at the NIH Clinical Center, Volochayev was employed as a Clinical Research Nurse, AD-0610-1. Doc. No. 8 Ex. H:8 at 1.[1] Volochayev's first-line supervisor was ICU Nurse Manager Deborah Kolakowski ("Kolakowski"). Doc. No. 8 Ex. B at 13. Volochayev's second-line supervisor was Tannia Cartledge ("Cartledge"), the Clinical Center's Deputy Chief Nurse Officer, and his third-line supervisor was the Clinical Center's Chief Nurse Officer, Clare Hastings ("Hastings"). Doc. No. 8 Ex. C at 467, 471; Ex. H: 21.

### A.    Allegations of Discrimination and Prior EEO Activity

In regard to national origin discrimination, Volochayev alleges that a fellow nurse, Emmanuel Samedi, told him at one point that Cartledge had made derogatory comments about Russians, stating that Russians could not be trusted and did not belong in Federal service. Doc. No. 8 Ex. 1 at 26-27. At the administrative hearing, Samedi denied making these comments to Volochayev, and Cartledge testified that she never made these comments. Doc. No. 8 Ex. D at 809-10; Ex. F at 1054-55. Volochayev also alleges that on one occasion in February or March of 2007, he had just returned from Russia and brought some vodka for a co-worker as a gift, and

---

[1]Many of the exhibits provided by Defendant constitute exhibits within exhibits. For example, the exhibit referred to here is Exhibit 8 within Exhibit H. For ease of reference, the Court will cite to such exhibits consistent with the cite above.

Kolakowski walked by him and said "Well, you Russians always talking about vodka." Doc. No. 8 Ex. B at 206. Volochayev also alleges that Kolakowski made a general comment around the time of his yearly evaluation in February 2007 that Russians were not "subordinate to superior." Doc. No. 8 Ex. H:22 at 1, Ex. I at 22, 23, 33, 35-36.

Additionally, an incident occurred in February 2007 where Connie Kotefka, a clinical educator, e-mailed Volochayev, copying Kolakowski, with respect to certain tasks she believed Volochayev had failed to do. Volochayev responded by e-mail, taking issue with Kotefka's conclusions and telling Kotefka to "next time be more professional" and to operate on the basis of facts "and not baseless assumptions." Doc. No. 8 Ex. M:1. Volochayev subsequently talked to Kotefka about the incident, and Volochayev alleges that he threatened to sue at that point. Doc. No. 8 Ex. H:14.

Kotefka, allegedly believing that the issues raised in Volochayev's e-mail had been resolved by their discussion, followed up her conversation with Volochayev with an e-mail spelling out her account of what had been said in the conversation with Volochayev. Doc. No. 8 Ex. F at 1060-63, 1067, 1070. The e-mail does not mention Volochayev's statement that he intended to sue or that Volochayev had complained of discrimination. *Id.* Volochayev then sent a second e-mail in which he told Kolakowski and Kotefka of his intent to contact an attorney or otherwise invoke the EEO process. Doc. No. 8 Ex. I at 42-43, 46; Ex. B at 120-21, 160-61. Both Kolakowski and Kotefka state that they never received the e-mail, and Volochayev was unable to produce the e-mail in response to the Agency's discovery request. Doc. No. 8 Ex. C at 478, 480; Ex. F at 1060-61, 1064-65, 1070.

B.    Events of September 29-October 1, 2007

On the evenings of September 29 through October 1, 2007, Volochayev was working the night-time shift in the ICU, and was responsible for a patient who will be referred to as Patient X. Doc. No. 8 Ex. I at 49-50. The physicians treating Patient X had given orders for Patient X to receive a continuous intravenous drip of fentanyl, a controlled substance, for pain management. Doc. No. 8 Ex. B at 31-32, Ex. H:17 at 12-17. The fentanyl, which comes in IV bags of 60ml, was to be dispensed at a rate of 6ml per hour. *Id.* Accordingly, it should have taken each bag about 10 hours to run out. Prior to beginning Volochayev's shift at 7:00 p.m. on September 29, the first bag of fentanyl was hung at 2:25 p.m. Volochayev reported that the bag had run out at 8:00 p.m., about 5 ½ hours after it was hung, and hung a second bag. Doc. No. 8 Ex. H:17 at 12, 13; Ex. I at 51-52, 56; Ex. B at 32-33. The Controlled Substance Infusion Record indicates that this bag ran out five hours later at 1:00 a.m. on Sunday, September 30. Volochayev hung a third bag at this point, but realized about three hours later that that bag was also running out and was almost empty. Doc. No. 8 Ex. H:17 at 14, Ex. B at 34.

At this point, Volochayev reported the incident to the charge nurse on duty, Danielle Gawlick. Doc. No. 8 Ex. B at 241-43. Kolakowski later testified that had Volochayev not reported the fentanyl incident, she would not have found out about it. Doc. No. 8 Ex. C at 575. Gawlick, Volochayev, and another nurse, Jacqueline Cooper, checked the patient's vital signs and found the patient was stable and showed no symptoms of overdose such as depressed blood pressure or heart rate. Doc. No. 8 Ex. I at 60, 63, 68, 76. They then checked the bed and the area around the pump and IV line to determine whether there was a leak in the line or a problem with the pump. Doc. No. 8 Ex. I at 57-58; Ex. B at 36, 40, 129-31, 240-41. Nothing seemed to be out

of the ordinary except for the missing fentanyl. *Id.* Gawlick replaced the pump and contacted the pharmacy to confirm that the right amount of fentanyl had been dispensed (it had). Doc. No. 8 Ex. B at 240-41. Cooper later described how Volochayev would have looked had he infused fentanyl on himself and said that Volochayev never displayed any of those symptoms. Doc. No. 8 Ex. B at 135.

Volochayev hung another bag at 6:00 a.m. on Sunday, which remained in use for the next fourteen hours until Volochayev came back for his shift that evening. Doc. No. 8 Ex. H:17 at 9, 15. Later that evening, another bag ran dry in half the time it should have. Doc. No. 8 Ex. B at 188-89. Volochayev then hung another bag, which ran dry after only 1 ½ hours. Doc. No. 8 Ex. B at 158-59. At that point, Volochayev contacted Parvin Safavi, the charge nurse on duty that evening to report the problem. *Id.* Again, they checked the patient, who was stable and showed no signs of overdose, and the tubing and floor to determine if there was any leakage (there was none), and contacted the pharmacy to confirm that it had dispensed the proper amount of fentanyl (it had). Doc. No. 8 Ex. B at 43, 277, 290, 299.

C.      Investigation of Volochayev's Conduct

Because of questions surrounding the fentanyl incident and because Safavi had reported that Volochayev delayed reporting the incident, Volochayev was questioned by Pamela Horwitz, the assistant nurse manager. Doc. No. 8 Ex. H:17 at 1; Ex. C at 384-85. Volochayev did not know why the fentanyl discrepancy occurred. *Id.* He stated that the patient's mother may have been in the room the first night, although he was not sure about the exact time. After Volochayev had been questioned, Kolakowski instructed Horwitz to investigate the matter by running tests on

the pump, looking over Controlled Substance Infusion Records, and looking into how Volochayev had handled the administration of controlled substances over the prior month. Doc. No. 8 Ex. L at 40-43; Ex. H:17; Ex. C at 386-87, 672-75, 496-99. Specifically, Kolakowski alleges he was looking for whether Volochayev had a pattern of failing to document the administration of controlled substances. *Id.*

As a result of the investigation, Horwitz found that Volochayev had removed doses of controlled substances from PYXIS, the pharmacy's computerized record system, on twenty-one occasions over the past month but had provided no documentation in the system as to the administration of those doses. Doc. No. 8 Ex. M:7; Ex. M:8; Ex. C at 388-91, 394-96, 402-03, 404. Volochayev contends that four of these occasions relate to the fentanyl incident, on the grounds that Volochayev failed to document waste related to the unused fentanyl. Volochayev alleges it would have been improper for him to do so when he didn't know what had happened to the fentanyl. In addition to the twenty-one violations, Horwitz found eleven instances in which Volochayev had removed controlled substances and failed to document how much of the dosage was given. *Id.* Eight of these instances involved range dosages while the other three involved situations in which Volochayev took out more of the controlled substance than had been ordered. Volochayev argues that he was not required to document the amount of medication administered in the three instances not involving range doses because he is only required to report the amount of medication administered in cases where the physician prescribed a range dose. Doc. No. 8 Ex. F at 119-1222.

Additionally, the investigation revealed that on at least five occasions Volochayev had inputted into the system that he had administered controlled substances before he had actually

removed the drugs from PYXIS. *Id.* However, Volochayev notes that on one of those occasions the discrepancy was a mere three minutes. Doc. No. 8 Ex. M:7; Ex. M:8. Cooper, one of the nurses who helped with the fentanyl incident on September 29, states that a failure to document happens to her and others all the time and that following protocol completely is sometimes an impossibility. Doc. No. 8 Ex. B at 137. However, Cooper testified that 20 failures to document in a single month is "not common." Doc. No. 8 Ex. B at 155. Horwitz testified that she has "[a]bsolutely not" ever seen a situation with this many failures to document controlled substances within a month. Doc. No. 8 Ex. C at 414. Kolakowski similarly stated that she had "never seen a situation" like this. Doc. No. 8 Ex. C at 524. Cartledge stated that she considered the problems to be "very significant" and that "[i]n all [her] years of experience in this position and with employees," she had never seen such discrepancies. Volochayev contends that the charge nurse did not see the initial fentanyl incident as a crisis and questions why his supervisors undertook such an investigation in the first place. Doc. No. 8 Ex. H:18.

As a result of the investigation, Kolakowski and Horwitz met with Volochayev on October 3 to discuss their findings. Doc. No. 8 Ex. H:17 at 3-4; Ex. C at 411, 508. Volochayev explained the discrepancies by stating that he was distracted and failed to document appropriately. *Id.* Kolakowski asked Volochayev to provide an explanation in writing. *Id.* Later that day, Volochayev responded in an e-mail and provided an account of what had happened with the fentanyl bags over the weekend (basically the account illustrated above); and stated that he may have been distracted in instances in which he failed to document properly. Doc. No. 8 Ex. M:9.

Regarding another instance of removal of fentanyl on September 14, Volochayev stated that he may have removed the fentanyl at the request of another nurse for use by another patient. Doc. No. 8 Ex. H:17 at 4, Ex. C at 408, 412, 417, 508, 510, 512-14, 580. Volochayev did not remember the nurse or patient who may have requested the fentanyl. Volochayev also later stated that someone may have taken his PYXIS code and removed the drugs. However, Volochayev's key-card was used for entry, so someone would have had to have stolen his key-card. *Id.*

D.  Proposal to Remove Volochayev and Resulting Removal

After the investigation was completed, Kolakowski informed Cartledge that she was very concerned about Volochayev returning to the ICU unit. As Volochayev's second-level supervisor, Cartledge was the decision-maker in the formal recommendation to remove Volochayev. In reaching her decision, Cartledge consulted with NIH Human Resources specialist Erica Smith, Clinical Center Deputy Director for Workforce Relations Hillary Fitilis, and Kolakowski. Cartledge alleges that her final decision to remove Volochayev was based on: (1) the pervasiveness of the conduct, given the number of discrepancies within a one-month period, Doc. No. 8 Ex. D at 779-780, 801; (2) Volochayev's lack of explanation for how the conduct occurred, *id.* at 803; (3) concern about potential risks to patients, although there is no contention Volochayev endangered patients through his prior violations, *id.* at 780, 802; (4) impact of Volochayev's violations on the Agency's accreditation and research, *id.* at 802; (5) Volochayev's knowledge of the procedures in question, *id.* at 803; (6) Volochayev's prior performance rating, which was "Minimally Successful" on a scale of Exceptional, Fully Successful, Minimally Successful, and Unacceptable, *id.* at 802, Doc. No. 8 Ex. H:22 at 1, 4, 7;

and (7) given all the above factors, Cartledge contends she found removal to be the appropriate course of action considering the "Table of Penalties", which lists different possible penalties for Volochayev's violations from reprimand to removal, Doc. No. 8 Ex. D at 802, 804, 854 Ex. H:27 at 11.

On December 7, 2007, Cartledge issued a Notice of proposed Removal to Plaintiff. Doc. No. 8 Ex. H:18 at 1-6. The charges stating the bases for removal relate to the findings from the Agency's investigation. *Id.* On January 11, 2008, Volochayev filed a reply to Cartledge's proposal stating that the Agency was retaliating against him for disagreeing with management and that preferential treatment had been given to certain employees. Doc. No. 8 Ex. H:19. Volochayev contended that there were other nurses who had engaged in worse misconduct without being disciplined. *Id.* The Agency investigated Volochayev's claims. *See* Doc. No. 8 Ex. M:17, Ex. E at 998-99, 1001-02, 1007, 1023-24. However, after reviewing the record, on March 24, 2008 Deciding Official Clare Hastings issued a decision to remove Volochayev from Federal service. Doc. No. 8 Ex. H:20 at 1-2. Hastings found that Volochayev had failed to explain his failures to document, and that such failures potentially threaten the Clinical Center's accreditation. *Id.* Hastings also noted that she did not find merit in Volochayev's claim that the Agency was retaliating against him for reporting unlawful preferential treatment of staff because Volochayev had never filed a grievance or complaint to that effect. *Id.*

On July 3, 2008, Volochayev filed a formal complaint before the EEOC. The parties engaged in discovery from late January through August 2009. Doc. No. 8 Ex. O. The parties then held six days of hearings that occurred between October 14, 2009 and September 21, 2010. *Id.* On September 24, 2010, ALJ David Norken issued a verbal bench decision over the telephone

finding in the Agency's favor. Doc. No. 8 Ex. A. Specifically, Judge Norken found that: (1) Volochayev had failed to make a *prima facie* showing of national origin or retaliation discrimination; (2) the Agency had given legitimate, non-discriminatory reasons for its termination of Volochayev; and (3) Volochayev had failed to demonstrate that the Agency's reasons were a pretext for national origin discrimination or retaliation. *Id.* at 35-37. This Court is not reviewing the ALJ's decision but is reviewing the record *de novo* in this case.

On January 26, 2011, Volochayev filed suit in this Court for discrimination based on national origin and retaliation for protected activity in violation of Title VII. Now pending before the Court is the Agency's motion to dismiss Volochayev's Complaint.

## II.     STANDARD OF REVIEW

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). The Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for

the non-moving party." *Anderson,* 477 U.S. at 248. Although the Court should believe the evidence of the nonmoving party and draw all justifiable inferences in his or her favor, a party cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

## III.    ANALYSIS

Volochayev asserts claims under Title VII for retaliation and discrimination based on national origin. After reviewing the record, the Court does not believe Volochayev's claims can survive summary judgment. The extensive record in this case shows that Volochayev's failure to follow proper documentation procedures with regard to controlled substances, rather than a discriminatory or retaliatory intent, led to Volochayev's removal from his Clinical Research Nurse position.

### A.    Request for Additional Discovery

As a preliminary matter, the Court will consider Volochayev's request for additional discovery in this case. Rule 56(d) of the Federal Rules of Civil procedure provides that a Federal district court may allow a non-moving party additional time to take discovery if the non-movant "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Here, Volochayev's counsel submitted an affidavit contending that additional discovery is appropriate so that Volochayev can obtain: (1) a review of all PYXIS records for a one-year period from all nurses supervised by Kolakowski and other nurses under the supervision of those involved in disciplining Volochayev; (2) the experience level of each

nurse; (3) Volochayev's patient charts; (4) a deposition regarding other instances in which a drug was unaccounted for at NIH; (5) the national origin of the individual who replaced Volochayev, if any; and (6) discovery with respect to Volochayev's performance between the time of his complaints until the fentanyl incident. *See* Doc. No 13 Ex. 4.

Denial of a Rule 56(d) motion is appropriate where: (1) the materials sought in the Rule 56(d) motion "could have been sought during the discovery period"; and (2) the non-movant has "been diligent in pursuit of their discovery rights." *CBRE Realty Fin. TRS, LLC v. McCormick*, 414 Fed. Appx. 547, 551 (4th Cir. 2011). Additionally, this Court has found denial of a Rule 56(d) motion appropriate when "the administrative record pertaining to these claims is substantial." *Murchison v. Astrue*, 689 F. Supp. 2d 781, 798 (D. Md. 2010);[2] *see also Palmer v. Barnhart*, No. WDQ-04-323, 2005 WL 6138318, at *2 (D. Md. Aug. 25, 2005) (denying Rule 56(f) motion where plaintiff had ample opportunity to develop her case during EEOC hearing).

As in *Murchison*, the Court in this case is presented with a voluminous administrative record that is the product of seven months of discovery and a five-day hearing. The Court was surprised to find that Volochayev did not seek information during discovery at the administrative level regarding the national origin of the individual who replaced Volochayev, since this is central to a *prima facie* showing of discrimination. However, Volochayev has not alleged that this information could not have been sought during the discovery period. The Court finds that Volochayev had a full opportunity to develop discovery at the administrative level, and thus the interests of justice and judicial expediency weigh against re-opening the discovery record at this stage. Moreover, for the reasons discussed below the Court would grant the Agency's motion for

---

[2]*Murchison* dealt with a Rule 56(f) motion. Rule 56(f) was recodified on December 1, 2010 and is presently identified as Rule 56(d).

summary judgment even if discovery were to reveal that Volochayev was in fact replaced by a non-Russian. Accordingly, Volochayev's request to re-open the record for additional discovery is denied.

B.    Discrimination on the Basis of National Origin

The Court now moves to Volochayev's claim that his rights under Title VII were violated when he was removed from his position as Clinical Research Nurse because of national origin discrimination. Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 200e-2(a)(1). Volochayev, who is Russian, argues that the Agency removed him because of his national origin. Volochayev may prove this alleged violation of Title VII in either of two ways: (1) by "using any direct or indirect evidence relevant to and sufficiently probative" of discriminatory purpose, or (2) by using the burden-shifting approach outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

Volochayev contends that his claim succeeds under the *McDonnell Douglas* burden-shifting approach. Under this scheme, the plaintiff must first must establish a *prima facie* case of discrimination. *See McDonnell Douglas Corp.*, 411 U.S. at 802.  To establish a *prima facie* case, Volochayev must show that: (1) he is in a protected class; (2) he suffered an adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or

was filled by similarly qualified applicants outside the protected class. *Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011).

If the plaintiff meets this burden, the defendant must present a legitimate, nondiscriminatory reason for the challenged conduct. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000) (citing *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). If the defendant succeeds in doing so, that will rebut the presumption of discrimination raised by the plaintiff's *prima facie* case. *See Stokes v. Westinghouse Savannah River Co.*, 206 F.3d 420, 429 (4th Cir. 2000) (citing *Burdine*, 450 U.S. at 255 n.10). The plaintiff then must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. In the end, "[t]he plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against her." *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (citing *Burdine*, 450 U.S. at 253).

The Agency argues that Volochayev cannot establish a *prima facie* case because Volochayev failed to perform his duties at a level that met the Agency's legitimate expectations at the time of his removal. The Agency contends that even if Volochayev established a *prima facie* case, it has established legitimate, nondiscriminatory reasons for removing Volochayev: the pervasiveness of Volochayev's documentation issues, his awareness of the procedures in question, the institutional risks raised by his conduct in regard to the Agency's accreditation, and his prior performance ratings. The Agency asserts that Volochayev has not offered any evidence to show that either Cartledge's reasons for proposing removal or Hastings' reasons for removing Volochayev were pretext for a discriminatory purpose.

Volochayev contends that his failures to document controlled substances impacted no one, caused no injury to any patient, and did not damage the hospital in any tangible way. Volochayev contends that the charges against him are without merit and a product of Kolakowski's discriminatory animus. Volochayev argues that he should have received counseling or otherwise have been given a chance to improve, like other employees, before being removed. Although Volochayev is correct that his documentation issues did not hurt any patients, Volochayev fails to show that his failures to document controlled substances did not risk damaging the Agency's accreditation, research, and funding. Furthermore, Volochayev was rated as "minimally successful" in a performance rating that dates back to the period of June 30-December 31, 2006, based in part on the fact that Volochayev needed to "[i]mprove documentation" and "[a]dhere to NPCS policies, procedures and SOPs that guide clinical practice." Doc. No. 8 Ex. H:22 at 1, 4, 7. This suggests that Volochayev's documentation issues have been an issue throughout his employment.

Volochayev contends that he was treated differently from similarly situated employees Mark Pavlick and Carol Wingfield. Specifically, Volochayev contends that Wingfield had nine reports of discrepancies for medication and documentation errors but was given verbal counseling instead of being removed. However, Volochayev has not refuted the Agency's contention that Wingfield was not in fact similarly situated because she had not yet completed her competencies and was not fully trained at the time of her violations, whereas Volochayev had worked several years as a trauma nurse before being hired by the Agency. Moreover, Wingfield's violations were far less pervasive than Volochayev's, where she had committed only a few violations each month.

Additionally, Volochayev contends that Pavlick, a similarly situated employee, was given five separate counseling sessions before being removed for seven violations, one which could have been life-threatening to a patient. Doc. No. 8 Ex. C at 558. Pavlick's violations occurred over a period of nine months, and each dealt with a breach of a different rule. Although Volochayev's conduct did not threaten any patients, the Court finds that Volochayev was not similarly situated to Pavlick where Volochayev engaged in multiple violations of the same rule, suggesting disregard for Agency practices and rules rather than mere negligence on isolated occasions.

Taken as a whole, Volochayev's numerous violations relating to the documentation of controlled substances suggest that Volochayev was struggling to adhere to the Agency's policies and procedures. Given the Agency's concern that Volochayev "[i]mprove documentation" in order to "meet[] the performance expectations in the ICU," demonstrated from the beginning of Volochayev's employment, the Court finds that Volochayev was not satisfying the Agency's legitimate expectations at the time he was removed.

Accordingly, the Court finds that Volochayev has not established a *prima facie* case of national origin discrimination. Even if Volochayev had established a *prima facie* case, Verizon has presented legitimate, non-discriminatory reasons for terminating Volochayev: his pervasive documentation violations relating to controlled substances. The Court does not find that Volochayev presented any evidence to show that the Agency's legitimate, non-discriminatory reasons were pretextual. Volochayev has not shown or even suggested that Hastings, the final decision-maker in the decision to remove Volochayev, did not reasonably believe that

Volochayev had engaged in pervasive violations of a kind that jeopardized the integrity of the Clinical Center's procedures and potentially threatened its accreditation.

Moreover, Volochayev has not shown that his nationality played any role in either Cartledge's decision to recommend Volochayev for removal or Hastings' decision to remove Volochayev. Rather, the most Volochayev can show is that Kolakowski, who Cartledge consulted in making her recommendation to remove, made at most two isolated comments about Volochayev's nationality, the most recent occurring more than six months before the initial investigation that prompted Volochayev's removal. Volochayev has also not shown that his nationality was ever discussed at any point throughout the investigation or in discussions regarding his removal. For these reasons, the award of summary judgment to the Agency is appropriate on Volochayev's discrimination claim.

B.      Retaliation

In count two, Volochayev alleges that the Agency retaliated against him in violation of Title VII when, in response to his complaints to his supervisor Kolakowski about discriminatory treatment, the Agency removed Volochayev. The Agency contends that Volochayev cannot establish a *prima facie* case under these facts.

Title VII makes it unlawful for "an employer to discriminate against any of [its] employees . . . because he has opposed any practice made an unlawful practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 200e-3(a). The Court analyzes a retaliation claim using the *McDonnell Douglas* framework. *Causey v. Balog*,

162 F.3d 795, 803 (4th Cir. 1998). A *prima facie* case for retaliation exists where: (1) the plaintiff engages in protected activity; (2) an adverse employment action occurs against the plaintiff; and (3) there is a causal connection between the protected activity and the employment action. *Causey*, 162 F.3d at 803. The plaintiff's burden in this regard is "not onerous"; it requires only that he prove each element by a preponderance of the evidence. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

The protected activity cited by Volochayev is his sending an e-mail to Kolakowski in April 2007 threatening to go to the EEO or his lawyer if management continued what Volochayev believed were discriminatory practices against him. Complaining about discriminatory treatment relating to a protected class is protected under the opposition clause of § 2000e-3(a). *See Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir. 1981) ("The opposition clause has been held to encompass informal protests, such as voicing complaints to employers or using an employer's grievance procedures."). However, there is no evidence that the discriminatory conduct of which Volochayev was referring had anything to do with his national origin. Indeed, at no point in the incident leading up to Volochayev's e-mail did he mention his national origin or anything else that would imply his complaints related to prohibited discrimination. Thus, Volochayev has not shown that he engaged in a protected activity as necessary to satisfy the first element of the *prima facie* case.

However, even if Volochayev had shown that he engaged in a protected activity, Volochayev has not alleged a sufficient nexus between his internal complaints and his removal. While Volochayev asserts that he complained about discrimination in an e-mail, Kolakowski and Kotefka, the intended e-mail recipients, both testified that they never received the e-mail, and

Volochayev has not presented any evidence suggesting that they did. Given that Kolakowski was not aware of the complaint, Volochayev cannot show a causal connection between his complaints and his removal. Furthermore, Volochayev has presented no evidence other than his subjective belief to show that he was removed because he complained to Kolakowski. Volochayev's retaliation claim also fails because, for the reasons stated in the discrimination section above, the Court finds that the Agency presented legitimate reasons for removing Volochayev that Volochayev has not shown to be pretextual. Accordingly, Volochayev's retaliation claim must also be dismissed.

## IV.    CONCLUSION

For the foregoing reasons, the Agency's motion for summary judgment is GRANTED. A separate order will follow.


October 5, 2011                                                      /s/
        Date                                          Alexander Williams, Jr.
                                                      United States District Judge